### TEXAS CO. v. SINCLAIR REFINING CO.
### No. 98.

Circuit Court of Appeals, Second Circuit.

Feb. 1, 1937.

Drury W. Cooper, Newton A. Burgess, and Daniel Stryker, all of New York City, for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds, Frank E. Barrows, Raymond F. Adams, and S. Howell Brown, Jr., all of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree which dismissed for invalidity a bill in equity to enjoin infringement of claims 1, 2, 3, 5, 6 and 7 of Patent No. 1,599,854, for a locomotive grease. Reasonably satisfactory results had been obtained in the lubrication of the driving journals of locomotives with earlier greases until 1919, but at about that time the locomotives increased in capacity and weight and their journals began to give trouble. This gradually grew worse, until by the end of 1921 it became very serious, at least in the case of the Norfolk & Western Railway, for relief of which road the patented grease was invented. The particular difficulty had been that with the increased weight the friction increased, and the ensuing heat boiled out the water in the old grease and granulated it. The application was filed on September 21, 1923, about fourteen months after the first batch of grease had been used. It recited that the chief defect of the older greases had been that they contained from seven to fifteen per cent. of water, which would boil off when the journals reached temperatures equal to or beyond the boiling point of water, as they did. For these reasons the primary object of the invention was to provide a grease free from much water; it was to be "composed essentially of a high melting point soap compounded with a high boiling point hydro carbon oil." (Page 1, lines 44–46.) "Various soaps may be used and various fatty oils and fatty acids may be employed * * * We prefer however to use a soda soap and to prepare the soap from animal fatty oils such as tallow or tallow oil." (Page 1, lines 53–58.) To "describe" their invention the inventors then gave "a specific example," although they did not wish to be limited to the exact proportions mentioned. The ingredients were approximately 7% of caustic soda, 48% of hard tallow and 45% of "cylinder stock" (a well-known trade term); the "soda was dissolved in water, mixed with a tallow heated" to produce saponification after which the "stock" was added and "the mixture heated to remove substantially all the water. An analysis of the product formed in the treatment disclosed the following composition." (Page 1, lines 84–90.) This analysis showed 46% soda soap, .4% free alkali, 4.76% glycerin, 48.14% "cylinder stock" and .4% water. The melting point of this compound was said to be 450° F. and it remained efficient "above the boiling point of water." The specifications then described the process by which the grease could be made. It was desirable, though not necessary, to prepare the soap before adding the oil. Alkali and tallow were to be mixed and the mixture boiled until the major portion of the water was boiled off. The cylinder oil was then added and the mass heated substantially above the melting point of the mixture, which was generally 450° to 500° F. This temperature had to be maintained "usually several hours until substantial dehydration is effected." (Page 2, lines 21–22.) No material amount of water then remained, although a trace of it appeared to be necessary to insure the colloidal suspension of the "stock." The product was then drawn off and when cooled was ready for shipment. All the claims in suit are for a dehydrated grease of "cylinder stock," or hydro carbon oil, and a soda soap. In claims one and three the stock and soap are in "equal proportions"; in claim two the melting point of the grease is 450° F.; in claim five it is 400° F.; and claims six and seven are like number five.

The plaintiff's embarrassments from the analysis just quoted are inescapable. It asks us first to suppose that it was not intended as a record of actual work upon a batch of grease, but only as a "calculated analysis," a term which the art understood, and by which it would not be misled. Why a "calculated analysis" should be so different we do not see; it would seem that anyone following the directions might be as readily put wrong by it, as by an actual analysis. Be that as it may, the language is

clear; "an analysis of the product formed in the treatment disclosed," can only mean one thing; that the inventors had in fact analyzed their product, and were giving the result. Five per cent. of glycerin was what they had found, not what they had calculated; indeed, one of the patentees, Van Gundy, conceded that he did not then understand that no glycerin should be present. The plaintiff answers that all glycerin will disappear from the product if the process disclosed is followed. Even so, we are not prepared to agree that that would inevitably correct the mistake; the claims in suit are for a product, not a process; and if a man following the directions, found that he did not get the product as the specifications described it, nobody can say what he might conclude. He might think that the glycerin had gone off by too much boiling; he might, or might not, think more glycerin should be added; perhaps it mattered, perhaps it did not. Specifications ought not leave the art in such uncertainties. Matheson v. Campbell, 78 F. 910, 916 (C.C.A.2); Leonard, Inc. v. Maxwell, 252 F. 584, 590 (C.C.A.2); Health Products Corp. v. Ex-Lax Mfg. Co., 22 F.(2d) 286 (C.C.A.2). But the situation is not so favorable to the patent even as that. Glycerin has a boiling point of over 500° F., and all the patent requires is that the water shall be boiled off. It is true that it prescribed boiling at 450° to 500° F. for "usually several hours"; and such boiling in an open vat might be enough. But it was not the uniform practice to use open vats; sometimes they were covered by hoods with an opening at the top to let out the vapors. In such a vat some of the glycerin will condense on the inside of the hood and fall back into the mass beneath. There is evidence that the product so prepared contains over two per cent. of the glycerin; how far the rest has been boiled off, how far at such temperatures it has combined with the caustic soda, we cannot know. The specifications neither make plain that glycerin shall be altogether eliminated, or declare what is its tolerable upper limit, if it need not be. Once more the art was not adequately instructed. That does not invalidate the patent, if the claims be construed as neutral as regards glycerin, but it deprives the invention of any value, because glycerin will ruin the grease; and moreover, if so construed, the claims were anticipated.

In 1919 the Atlantic Refining Company of Philadelphia was asked to supply a grease suitable for a very heavy coal breaker whose agitation imposed especially severe service upon its journals. To answer this demand the company prepared a new grease which they called, "C.C.," and which they have used publicly ever since on the breaker and elsewhere. Contemporary records of its composition were prepared which are in evidence, and which were explained and confirmed by the testimony of the chemist in charge, one Kaplan, and his assistant, Humphreys. In particular these men identified three batches which they had made by taking as a base some old "water-grease," which had turned out bad in manufacture, but of which they had wanted to save the materials. To this they had added tallow and stock, and as they had records both of the additions and of the original ingredients, it was possible to compute the proportions of the final product so made. The inventors themselves, before they filed their application, had several times used similar old batches of "water-grease" as a base, and the plaintiff cannot object to the method. In the first batch of "C.C." so produced, the soap was 47%; in the second, 48%; in the third, 44%; an average of about 46%, the very percentage of the analysis in the specifications. The plaintiff protests that nothing should be inferred from revamping such unmerchantable product, which had lain about long unguarded and subject to contamination; and although this criticism seems to us rather severe, we will confine ourselves to other batches made from fresh materials.

The percentage of soap in these before July, 1922, runs from 30% to 40% with an average of about 37%, against 46% in the analysis. Perhaps this is not the "equal portions" or "proportions" of claims one and three, despite the caution that "the proportions (sic) of soap and cylinder stock varies with the particular soap and oil used and the specific characteristics of the soap desired." (Page 1, lines 63–66.) On the other hand, although the "C.C." was boiled at a temperature of 300° F., and not of 450° F. as required in the specifications, that is not important, because the claims speak only of the melting point. And the melting point of "C.C." is 390° F. when the product contains about 36% soap, 2.43% glycerin and substantially no water. If the soap content be higher, the melting point will also be higher, though, even as it was, it was high enough for all the claims but number two. Thus it appears that the "C.C." varied from the patented grease only in that the percentage of soap and the melting point

were too low, but that with an increase of soap to "equal proportions" with the oil, there was every reason to suppose that the melting point of even claim two would have been attained.

If the claims, read as they must be without the elimination of glycerin, are valid at all, it can therefore be only because it was an invention to increase the percentage of soap from 37% to 46%, and that too in a situation where none of the conventional earmarks of invention are present. The art had not had to await the grease after the need for it arose. It is true that the heavier locomotives began to be used in 1919, say three years before it appeared, but the demand had not been immediately pressing, and was fulfilled directly it became so. There is no evidence that meanwhile others had been trying to find a proper grease and had failed. On the contrary by 1919 the Atlantic Refining Company had made that which we have described and which differed only in the proportion of soap. There was nothing critical in that difference; oil is the only lubricant, the soap is merely a carrier; the optimum would be pure oil, if it could only be kept in place. The inventors had merely found a new equilibrium between factors whose action and resultant were well known. Given the need, these pointed at least to experiments out of which the right grease would inevitably be detected. No more was needed than intelligence to perceive the cause of the failure of the old "water-grease" to meet the new conditions, and application of the well-understood principles of grease-making. So far as it was also necessary to eliminate glycerin, that the inventors did not understand, or in any case did not disclose. If they had, the simplest way would have been by confining the fat ingredient to fatty acids; that is the defendant's way. It was misleading to group together "fatty oils and fatty acids" (page 1, lines 53–54), as equally employable, and not even to intimate that they must be treated differently; in one case making sure to eliminate glycerin. Finally, although it is quite true that the grease has had great vogue, it is not universal; the Pennsylvania Railroad still uses "water-grease." The patent seems to us another instance of a kind which must become more and more common, as the arts advance in understanding and multiplication of detail, only a corollary of what had gone before, demanding no more than the competent use of knowledge already at hand. Courts have always discouraged efforts to dress up such advances, when exploited by well organized selling, as invention; that discouragement was never more proper than at the present time, at least while the patent law remains as archaic as it is. Perhaps if its presuppositions—now three hundred years old and not in their origin the result of inquiry—were reëxamined, it might transpire that pushing a new article into general acceptance is as deserving of reward as its invention, certainly if the test of invention be as factitious and subjective as it now is. But until that day comes, as it probably never will while the system lasts, we must continue to proceed as though we were dealing with actualities.

Decree affirmed.