## PLANT PRODUCTS CO. v. CHARLES PHILLIPS CHEMICAL CO.

### No. 298.

Circuit Court of Appeals, Second Circuit.
May 2, 1938.

Ambrose Selig, of New York City (Samuel E. Darby, Jr., of New York City, Jack B. Dworken, of Cleveland, Ohio, of counsel), for appellant.

David A. Woodcock, Watson, Bristol, Johnson & Leavenworth, and Edward S. Rogers, all of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree, dismissing a bill in equity for the infringement of claims one and three of patent No. 1,694,341, issued to Frank Crossley. The invention was for a process of producing from milk of magnesia a dry tablet, which, when immersed in water, should revert to that substance. Milk of magnesia is the colloquial name for magnesium hydroxide suspended in water; the drug, being in colloidal form, does not dissolve, but forms an emulsion, and will remain in suspension for an indefinite time, so that, if not frozen, substantially no water rises to the top, no matter how long it stands. The process described in the patent was to let milk of magnesia settle, to run off as much as possible of the water, and preferably to filter the precipitate so as "to remove from the magnesium hydrate the larger portion of water or moisture, the effect of which is to leave a precipitated soft mass of magnesium hydrate. This soft mass of material is then subjected to heat, in any desired manner, preferably a temperature of not exceeding 250°F, or such temperature as will remove all of the moisture in the mass (except its water of constitution), without affecting its physical, chemical or therapeutical properties" (p. 1, lines 23–34). The dried hydrate is then mixed with corn-starch and sugar, and this compound is "granulated" with alcohol, flavored and finally pressed into tablets. In several places the patent describes what will be the result when such a tablet is emulsified in water. It will "produce what is known as milk of magnesia" (page 1, lines 10); "it readily forms therewith milk of magnesia" (page 1, line 82); it will "yield about one teaspoonful of milk of magnesia, U.S.P." (page 1, lines 87, 88); "when dissolved in either manner milk of magnesia results" (page 1, lines 101, 102). Claim one was for the process: "The herein disclosed process which comprises drying precipitated hydrate of magnesium to remove therefrom substantially all moisture" etc. Claim three was for the product: "A wafer or tablet consisting of dried pure prepared precipitated hydrate of magnesia * * * of a consistency to form a relatively smooth paste, when subjected to water or saliva."

The defendant is an old manufacturer of milk of magnesia and makes and sells tablets which it advertises as a concentration in stable form of "true liquid milk of magnesia"; it declares that each tablet "contains one teaspoonful of genuine, concentrated, Phillips Milk of Magnesia; nothing is taken away except the moisture." Its process, which is secret, is not disclosed in the record; but we are told that in its answers to the plaintiff's interrogatories it swore that it dried the milk of magnesia at a temperature of 312° F; though the plaintiff denies the truth of this. It was proved upon the trial that the plaintiff's tablets did not revert to milk of magnesia in the colloquial sense at all. When they were dissolved in water, and the emulsion was allowed to settle, a

precipitate soon gathered at the bottom of the tube with much more supernatant water than ever gathers upon milk of magnesia, and no less than gathered when the tablets had been dried at 212°F, which, as the plaintiff asserts, quite destroys the colloid form. To meet this the plaintiff argued that it was not the ability of the magnesium hydroxide to remain in suspension, but this colloidal form, which is crucial; and the issue of colloids became the corner-stone of the plaintiff's case, although there is nothing in the specifications to justify such an interpolation, except that at the beginning of the specifications the invention is said to relate "to the preparation of magnesium hydrate and *preferably* a hydrate having an amorphous physical condition" (page 1, lines 1–3). In consonance with this position, the plaintiff's expert professed to see in an ultra-microscope colloidal clusters in both the plaintiff's and defendant's tablets when emulsified. He also made tablets by drying milk of magnesia at 312°F, and these showed no colloidal clusters, from which he inferred that the defendant must use a lower temperature. Thus, a zone of temperature emerged—between 212°F and 312°F—in some part of which the moisture might be dried off and a reversible tablet would result. The judge held that the patent was inoperable because the tablets would not in fact revert to milk of magnesia, that the specifications were not adequate, and that any invention disclosed had been anticipated.

 We find it unnecessary to hold the patent invalid because it is inoperable. It is quite true that tablets made as disclosed will not produce a stable milk of magnesia in the colloquial sense in which the patentee obviously used that phrase, as appears from the passages quoted. The public knew nothing about colloidal magnesium hydroxide and cared less; there is no evidence worthy the name that it is any better therapeutically in that form than in any other; and the limitation upon the disclosure is an ingenious attempt to escape the prior art, which would otherwise invalidate the claims. If, therefore, the disclosure be interpreted as the trade would understand it, its directions will not do what they profess to do. That has at times been made the test of operability (Engineer Co. v. Hotel Astor, D. C., 226 F. 779, 783, affirmed 2 Cir., 226 F. 949; Dalton Adding Machine Co. v. Rockford Milling Machine Co., D. C., 253 F. 187,

191), and strictly we might declare the patent invalid for this reason. However, it is a benign corollary to that doctrine that a patent is not invalid because it works imperfectly, if it will work measurably well; and although the plaintiff's tablets produce an emulsion out of which the magnesium hydroxide will soon precipitate, we are not entirely clear that this product should be classed as not milk of magnesia at all. Perhaps it may properly be called poor milk of magnesia.

We need not decide this, because the disclosure was in any event insufficient. All it said was that one should "remove all of the moisture in the mass (except its water of constitution) without affecting its physical chemical or therapeutical properties"; it did not say at what temperatures this would take place and how long it would take; nor how one was to determine whether the "properties" of the magnesium hydroxide had been "affected." But that is not all. The language on its face means what it says—"all of the moisture"—but to take it so, would be to miss the very kernel, which is absolutely vital to success. The obbligato, which gives its deeper meaning to this simple theme, is that a thin coating or jacket of water must remain around the colloidal clusters in the tablet in order to preserve their integrity. This is disclosed in claim one by the word "substantially"; in claim three by the phrase that the tablet shall be of a consistency to make a "smooth paste when subjected to water." It is hard to treat such an argument seriously, for it is no parody to say that the patentee—if the plaintiff's scholium upon the patent is accepted as it must be to avoid anticipation—said no more than that one must dry out as much water as one can without destroying the colloidal form of the drug; and that was obviously of no practical value whatever. There remained indeed the limit of 250°F, though the patent did not even commit itself to that; it is only a "preferable" limit. But no lower limit was suggested, and the defendant was quite justified, when in preparation for trial it selected the boiling point; there was no hint that at that temperature the drug would cease to be the all-important colloid. Moreover, even the upper limit was wrong, for the defendant goes more than sixty degrees higher; it is wholly unwarranted to charge it with perjury because it swore that it does. The only excuse for this aspersion is that if so, the magnesium

hydroxide would not remain a colloid; but as the plaintiff's expert did not, and could not, know the defendant's process, this conclusion was too tenuous to stand. For this reason, if it were possible to read the upper limit into the claims, the defendant would not infringe. The patent seems to us without merit; whatever Crossley discovered, he did not disclose—if he discovered anything at all—he told nothing, and, so far as appears, his disclosure has resulted in nothing. The plaintiff's tablets may be excellent, they may be better than what preceded them, they may owe everything to Crossley, but they owe nothing to the document before us.

Decree affirmed.