**ENGELHARD INDUSTRIES, INC.,**
**Plaintiff,**

v.

**SEL-REX CORPORATION, Defendant.**

**Civ. A. No. 1002-63.**

United States District Court
D. New Jersey.

May 10, 1966.

Meyner & Wiley, by G. Douglas Hofe, Jr., Newark, N. J., Roger T. McLean and John Boustead, New York City, of counsel, for plaintiff.

Pindar, McElroy, Connell & Foley, Newark, N. J., Richard Whiting and Stanley L. Amberg, Herbert Burstein, New York City, of counsel, for defendant.

MEANEY, District Judge.

Plaintiff brings this action for declaratory judgment under 28 U.S.C. §§ 2201 and 2202 and the patent laws 35 U.S.C. § 1 et seq., to declare defendant's United States Patent No. 3,104,212 invalid and uninfringed by plaintiff or its customers.

Defendant's amended answer set up a counterclaim alleging infringement of its patent by plaintiff and demanding injunctive relief, an accounting for profits and treble damages, the assessment of costs and attorneys fees against plaintiff, and other appropriate relief.

Plaintiff, Engelhard Industries, Inc., is a corporation of the State of Delaware, doing business at 113 Astor Street, Newark, New Jersey.

Defendant, Sel-Rex Corporation, is a corporation of the State of New Jersey, doing business at 75 River Road, Nutley, New Jersey.

The court's jurisdiction is founded upon 28 U.S.C. §§ 1338(a) and 1400(b), and the patent laws, 35 U.S.C. § 1 et seq.

Defendant Sel-Rex is in the business of manufacturing and supplying equipment and processes to the electrochemical industry, principally in the field of precious metal deposition.

On September 17, 1963 United States Patent No. 3,104,212 was issued to defendant as the assignee of Edwin C. Rinker and Robert Duva. The claimed invention "relates to improvements in the process of producing a ductile electrochemical pure gold plate and to the electrolyte for producing the same." The several beneficial objects claimed for the patent are obtained "by providing a relatively weak acid bath containing (1) a weak, stable, organic acid, and (2) gold as a cyanide (potassium gold cyanide, for example), the acidity of the bath being adjusted to pH 3–6" ("pH" being a measure of the hydrogen ion concentration in a solution, which determines the acidity or alkalinity of the solution. For pure water at 25°C. a pH of from 0 to 7 is acid, from 7 to 14 alkaline).

The patent in suit contains 18 claims, of which Nos. 1, 2, 5, 6, 12 and 14 are in issue. The invention is claimed in terms of both the method or process of electrodepositing gold and the electrolyte or bath which is used in the process.

A typical electrodeposition system consists of a tank containing an aqueous solution of the metal compound to be deposited, called the bath or electrolyte; a positively charged electrode, or anode; and a negatively charged electrode, or cathode. The electrodes are immersed in the electrolyte, spaced apart and connected externally to a direct current power source. The current, when turn-

ed on, flows between the anode and the cathode, and the positively charged metal ions in the bath "plate out" as atoms on the cathode, forming a coating of the metal which was in the compound. Various metals may be used as electrodes.

Defendant's process and bath were sold commercially for some years prior to the issuance of the patent, and still are, under the name Temperex. The bath is used primarily in electronic circuitry.

Since issuance of the patent and prior to the filing of the complaint, plaintiff has made and sold, but not used, "E-55 Gold Cyanide" which is a mixture of potassium gold cyanide and ammonium citrate, in proportions such that the gold content of the mixture is 50.0 per cent by weight. During the same period of time plaintiff has sold, but neither made nor used, "E-55 Conducting Salts" which is dibasic ammonium citrate, the ordinary ammonium citrate of commerce. Plaintiff advises its customers to use the products in proportions of 3.0 ounces of the E-55 Gold Cyanide per gallon of electroplating solution and 150 grams of E-55 Conducting Salts per gallon of the same solution. The electroplating solution when thus made up has a pH of about 5.2, and plaintiff recommends to its customers that the pH be adjusted to between 5.5 and 6.0 by the addition of ammonium hydroxide.

Defendant's position is that the Engelhard bath is the chemical equivalent of its patented product, the only difference being the order in which the ingredients are added to the bath. It asserts—correctly—that the constituents in the Engelhard bath are the same as they would be if the bath were made up by using citric acid partially neutralized with ammonium hydroxide to bring its pH to 5.5, a method taught by the patent, instead of by using ammonium citrate and adjusting its pH with ammonium hydroxide, as is done by plaintiff's customers; and that plaintiff's bath therefore infringes the patent.

Plaintiff advances several grounds upon which it bases its contention that the claims of the patent involved are invalid: (1) invalidity under 35 U.S.C. § 112, the first paragraph, in that the specification does not contain a sufficient written description of the invention; (2) invalidity under 35 U.S.C. § 112, the second paragraph, in that the specification does not particularly point out and distinctly claim the subject matter of the invention; (3) invalidity under 35 U.S.C. § 102(a), (b) and (e), or 35 U.S.C. § 103, because the subject matter of the patent was anticipated by the prior art or was obvious to one skilled in the art at the time the claimed invention was made. Plaintiff also argues the applicability of the doctrine of file wrapper estoppel to the cause. These points will now be considered.

## I. *File Wrapper Estoppel*

Defendant's patent was granted based upon Application Serial No. 814,758. That application was in Interference No. 91,899 with Application Serial No. 830,122, filed by Robert A. Ehrhardt. The count of the interference was the following claim: "A method of electrodepositing gold which comprises electrolyzing a solution in which the initial ingredients consist essentially of citric acid and a complex cyanide salt of an alkali metal and gold, said solution having a pH value of about 3–6." Ehrhardt moved before the Patent Office Examiner to broaden the scope of the count to call for "a citrate ion-containing compound" in the place of "citric acid." Rinker and Duva opposed Ehrhardt's motion, which the Examiner denied as being broader than the disclosure of either party, saying: "The broad language of the proposed count calling for the addition of citrate ion-containing compounds reads upon the addition of such compounds to the exclusion of citric acid per se and there is no example in the application of Rinker et al. which discloses process which contains citrate ion but no citric acid."

Plaintiff argues that since its bath contains a citrate ion-containing com-

pound (ammonium citrate) but does not require citric acid in its preparation, defendant is estopped by the finding of the Examiner from asserting that defendant's patent covers plaintiff's bath.

█ The gravamen of file wrapper estoppel is that an applicant for a patent who acquiesces in the rejection of his claim, and accordingly modifies it to secure its allowance, will not subsequently be allowed to expand his claim by interpretation to include the principles originally rejected, or their equivalents. International Manufacturing Co. v. Landon, Inc., 336 F.2d 723 (9th Cir. 1964), cert. denied 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965), rehearing denied 380 U.S. 938, 85 S.Ct. 936, 13 L.Ed.2d 825 (1965); M. O. S. Corporation v. John I. Haas Co., 332 F.2d 910 (9th Cir. 1964); Metal Coating Corp. v. Baker Manufacturing Co., 227 F.Supp. 529 (W.D.Wis.1964). The doctrine does not apply where the applicant does not give up any element of his claim to meet an objection of the Patent Office Examiner. Toy Ideas, Inc. v. Montgomery Ward & Co., 172 F.Supp. 878 (D.Md. 1959).

█ It appears, and this court holds, that the doctrine of file wrapper estoppel does not apply in the instant case, where Rinker and Duva, the patentee's assignors, did not modify any of their claims in order to secure their patent, but rather opposed Ehrhardt's motion to broaden the count of the interference.

II. *35 U.S.C. § 112, the second paragraph*

█ The second paragraph of 35 U.S.C. § 112, provides in part: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. * * *"

Claims 1, 2, 5 and 6 of the patent in suit all provide that the gold which is sought to be plated out on the cathode is to be added "as a gold cyanide." The patent application also sets forth three examples indicating how the bath is to be made up. Examples 1 and 3 call for the addition of "Gold (as potassium gold cyanide)"; Example 2 specifies the use of "Gold (as cyanide)."

In preparation for trial, both parties conducted *inter partes* tests to prove the operability or inoperability of various types of baths relative to the patent in suit. In plaintiff's Tests Nos. 2A and 2B plaintiff prepared a bath which purported to follow Example 2 of the patent and which was composed of 47.2 grams per liter of sodium acetate; 2.8 grams per liter of acetic acid; 4.5 grams per liter of 88.3 per cent *gold cyanide*; and the remainder water. Both tests were run for ten minutes at a pH of 5.5, temperature of 70°F., current density of 10 amperes per square foot and fast cathode oscillation of 32 feet per minute. There was no evidence at all of any gold plate on the cathode.

Plaintiff argues that since the patent calls for the use of gold cyanide in the preparation of the bath and that since the bath is completely inoperable when gold cyanide is used, the patent "overclaims" the invention and is therefore invalid, citing Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949).

It is well known to one skilled in the art that gold cyanide is water insoluble and it is obvious that in order for defendant's bath to operate, the constituents must be dissolved in water. Further, the patent provides that the gold is to be added as the double cyanide of gold and an alkali metal and refers to potassium gold cyanide as an example. Why Example 2 of the patent is not consistent with Examples 1 and 3, which do call for potassium gold cyanide, is a matter of conjecture. But the court is convinced that the patent is not thereby rendered invalid since the "error" contained in Example 2 is readily explainable from the specifications read as a whole and is easily detectable and remediable by a person skilled in the art. See Balaban v. Polyfoto Corporation, 47 F.Supp. 472 (D.Del.1942).

III. *35 U.S.C. § 112, the first paragraph*

35 U.S.C. § 112, provides, in the first paragraph, that: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

Plaintiff contends that the specification does not contain a written description of the invention which will enable one skilled in the art to make and use the same. To support this contention it relies on its *inter partes* tests Nos. 1A, 1B and 3. In Tests 1A and 1B plaintiff followed the directions given by Example 1 of the patent as to ingredients of the bath, pH (5.5 was used), temperature, and current density. Test 1A was run for 97 minutes and resulted in a coating of 28.2 microns which was brown in color, powdery and spongy, not ductile, and adherent to the cathode only to a small extent. Test 1B was the same as 1A except that a brass coupon was used as the cathode instead of the steel coupon used in 1A. In Test 1B the plating time was one hour and a coating of 21.1 microns was obtained which was of the same quality as the product of Test 1A. In plaintiff's Test 3, Example 3 of the patent was followed with the conditions above mentioned. Plating time was two hours. A brown, brittle deposit, not ductile, of a thickness of 33.6 microns, resulted. As to all three tests, the coating would have been of a poorer quality at 250–500 microns.

■ Plaintiff relies on the cases of Texas Co. v. Sinclair Refining Co., 87 F.2d 690 (2nd Cir. 1937) and Plant Products Co. v. Charles Phillips Chemical Co., 96 F.2d 585 (2nd Cir. 1938), in support of its contention of invalidity for inadequate disclosure. The court is in agreement with defendant's argument that in those cases the essence of the invention was not taught, the process disclosed in the specifications of the patents there involved being totally inoperative. Defendant says that plaintiff's tests above referred to, as well as its own *inter partes* tests Nos. 3, 4, 5 and 6, show that the Examples in the patent do disclose a bath and a process which are operative, although admittedly conditions of higher temperature and lower current density will give far better results. Defendant's Test 1 used the ingredients of Example 1 of the patent at a temperature of 150°F., pH of 3.75 and a current density of 3.5 amperes per square foot. A copper rod was used as the cathode and the plating time was 18.5 hours. The result was an excellent, 24 karat, smooth, ductile, gold-colored deposit of 200–250 microns thick. The conditions of temperature, pH and current density are within the broad range of the claims of the patent, and the court would be disposed to agree with defendant that the patent makes an adequate disclosure to one skilled in the art were it not for another compelling consideration, viz: the first paragraph of 35 U.S.C. § 112 requires that the specification set forth the best mode contemplated by the inventor of carrying out his invention. While the "best mode" argument is not explicitly raised by plaintiff, specific reference is made to the relevant statutory section and evidence on the point, in the form of the *inter partes* tests, was presented. There can be no question that the issue is before the court, by express or implied consent of the parties. See Fed.Rules Civ.Proc. 15(b); Hamill v. Maryland Casualty Co., 209 F.2d 338 (10th Cir. 1954); Underwriters Salvage Co. of New York v. Davis & Shaw Furniture Co., 198 F.2d 450 (10th Cir. 1952); 3 Moore's Federal Practice, par. 15.13(2) (2nd Ed. 1964).

■ All of the relevant *inter partes* tests indicated that the Examples given in the patent will yield a poor result. An excellent product is obtained at a higher temperature and lower current density, as defendant's Test 1 proved. Since

these latter conditions are within the range of the patent claims, defendant surely must have known that better results were obtainable under conditions other than those described in the Examples. In fact, Mr. D. Gardner Foulke, research director for Sel-Rex since 1959, testified that since 1959 the bath has normally been run at a temperature of about 150°F., the temperature of defendant's Test 1. It is therefore clear that the Examples described in the patent do not set forth the best mode of carrying out the invention, which is their apparent purpose in view of the wide range of the claims as to temperature and current density, and that defendant well knew this. As the court said in Benger Laboratories, Limited v. R. K. Laros Co., 209 F.Supp. 639, 644 (E.D.Pa.1962), affirmed 317 F.2d 455 (3rd Cir. 1963), cert. denied 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64 (1963); "A patentee must disclose the best method known to him to carry out the invention. Even if there is a better method, his failure to disclose it will not invalidate his patent if he does not know of it or if he does not appreciate that it is the best method. It is enough that he act in good faith in his patent disclosure. On the other hand, if he knows at the time the application is filed, of a better method to practice the invention and knows it for the best, it would make no difference whether or not he was the discoverer of that method."

Since defendant knew of a better method than was disclosed in the Examples to practice the invention, at the time the application was filed, it follows that the patent is invalid for failure to set forth the best method known.

IV. *The defenses of Prior Art and Obviousness—35 U.S.C. §§ 102(a), (b) and (e), and 103*

35 U.S.C. § 102 provides in part:

"A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or * * *

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent * * *."

Section 103 provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *"

Plaintiff relies on several patents and publications as anticipating defendant's product, thus invalidating the patent in suit.

■ The statutory presumption of patent validity (35 U.S.C. § 282) is weakened where the relevant prior art is not considered by the Patent Office. Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (3rd Cir. 1962); Scripto, Inc. v. Ferber Corp., 267 F.2d 308 (3rd Cir. 1959), cert. denied 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959). Here, only Rinker's patent No. 2,905,601 was cited by the Patent Office in the file of the patent in suit.

■ It is unnecessary to the invalidation of a patent for want of invention over the prior art that a complete anticipation thereof be disclosed in a single prior patent. Messing v. Quiltmaster Corporation, 159 F.Supp. 181 (D.N.J.1958); Westinghouse Electric Corp. v. Bulldog Electric Products Co.,

106 F.Supp. 819 (N.D.W.Va.1952), affirmed 206 F.2d 574 (4th Cir. 1953), cert. denied 346 U.S. 909, 74 S.Ct. 240, 98 L.Ed. 406 (1953). The same is true where a prior publication is relied upon. Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F.Supp. 1 (E.D.Pa.1958), affirmed 268 F.2d 395 (3rd Cir. 1959), cert. denied 361 U.S. 894, 80 S.Ct. 190, 4 L.Ed.2d 151 (1959).

Prior to the introduction of defendant's product into the market, the only commercially available baths for use in electronic circuitry, for which defendant's product is used, were the alkaline cyanide, or "free cyanide," baths. Acid solutions were, and apparently still are, used in electrowinning and electrorefining, which deal with the recovery of the metal from its ore and for which defendant's product is not used. The alkaline cyanide baths are composed basically of potassium or sodium gold cyanide and potassium or sodium cyanide ("free cyanide") and have a pH of 9–12. Besides claiming a superior bath as to the smoothness, ductility, hardness, corrosion resistance, uniformity, machinability and color of the gold deposit, the patentee claims that its bath does not attack base metal forms used in printed circuits, which had been a problem in the art. The essence of defendant's claimed invention, as mentioned above, is the use of a weak, stable, organic acid and gold as a cyanide (such as potassium gold cyanide), the acidity of the bath being adjusted to a pH of 3–6.

The British Patent No. 1180 to Cowper, issued in 1857, teaches that a bath may be prepared by adding tartaric acid to a double cyanide of potassium and the required metal (including gold) so as to precipitate a tartrate or bitartrate of potash, leaving the metal in the solution, which is then in a fit state to be employed for the electrodeposition of the metal. Thus, to make a gold plating bath, Cowper says to dissolve two ounces of chloride of gold in five pints of distilled water, add enough potassium cyanide (about 5 ounces) to convert the chloride of gold into the double cyanide of gold and potassium (potassium gold cyanide), place the solution in a stoppered glass vessel and add about 2 ounces of tartaric acid, or a sufficient quantity to precipitate the potash of cyanide in combination with the tartaric acid, and close the vessel airtight by inserting the stopper or otherwise submitting the solution to pressure, so as to confine the hydrocyanic acid fumes. When the tartrate has completely precipitated, the vessel is opened, the solution filtered, and the filtrate is then ready for use as a plating bath. A silver bath is prepared in a similar manner, but whereas a silver bath should be neutral, or nearly so, a gold bath may be made "sufficiently acid" by adding about half an ounce of tartaric acid to it.

In plaintiff's *inter partes* Test No. 6, a bath was prepared by adding 29.2 grams per liter of 41% gold potassium gold cyanide (gold as metal—12 grams per liter) to 15.7 grams per liter of tartaric acid. Potassium bitartrate was precipitated out and the filtrate, which had a pH of 4.9, was used as a plating bath at a temperature of 140°F., current density of 5 amperes per square foot and fast cathode rod oscillation. The plating time was 20 minutes and resulted in a smooth, lustrous, yellow gold, ductile deposit of 5.3 microns in thickness.

In plaintiff's Test No. 7, 36.6 grams of gold chloride or chloroauric acid were dissolved in a beaker containing 1 liter of water. To this was added a solution that was prepared by dissolving 44.1 grams of potassium cyanide and 29.3 grams of potassium carbonate resulting in a mixture containing 60% potassium cyanide. (The reason for preparing the cyanide in this manner was that the cyanides in use in Cowper's day were of an impure quality, containing up to 40% potassium carbonate.) 50 grams of tartaric acid were then added, causing effervescence of the solution and foaming over the sides of the beaker. Potassium bitartrate was filtered out and the filtrate was found to be at a pH of 6.5. One gram of tartaric acid was added, bringing the pH to 5.3. The solution

was then used as a plating bath for a period of ten minutes at a temperature of 50°C., current density of 5 amperes per square foot and no agitation. A smooth, ductile, lustrous, yellow gold deposit one micron thick was deposited, which may have become somewhat duller if a thicker coat had been put on, but which would have retained the other qualities. The conditions of plating employed in both of plaintiff's tests are in common use in the art.

It seems to this court that plaintiff's Tests 6 and 7 substantially followed Cowper's teachings and resulted in perfectly good plating baths. The differences between Cowper's bath and those used in plaintiff's tests appear to be insubstantial: the absence of the chloride ion in plaintiff's Test 6 is immaterial to the make-up of the bath since the only purpose of the gold chloride in Cowper is to make the potassium gold cyanide. There is no reason why a plater today should not use commercial potassium gold cyanide instead of taking the extra step necessary to Cowper of preparing it from the chloride and potassium cyanide. Further, the fact that in Test 7 the beaker was not stoppered, which made possible the overflowing caused by effervescence, is of no moment. The reason Cowper stoppered his vessel was to avoid inhaling toxic hydrocyanic fumes. In plaintiff's test a modern venting system obviated the need for the stopper. And the fact that some of the solution was lost by overflowing made no difference chemically in the final plating solution.

This court concludes from the foregoing that the Cowper patent teaches how to make an effective gold plating bath which employs tartaric acid (a "weak, stable organic acid" mentioned in defendant's specifications) and potassium gold cyanide and which has a pH within the range of defendant's patent, and that therefore Cowper is a complete anticipation of the patent in suit, rendering the latter invalid.

French Patent No. 708,469 to McCullough and Gilchrist, and its United States counterpart, Patent No. 1,863,869, teach that the excess "free cyanide" of a commercial alkaline cyanide bath can be replaced by "a tartrate or a citrate of an alkaline base such as sodium, potassium or ammonium." An article by Joseph E. Underwood which appeared in a trade publication shortly before the French patent was issued refers to a commonly used alkaline cyanide gold plating solution as being comprised of ¾ ounce of sodium gold cyanide and 6 ounces of sodium cyanide in one gallon of water, operated at a temperature of 170°–180°F. When an equal weight of ammonium citrate is substituted for the sodium cyanide in the Underwood bath, as McCullough says may be done, the pH of the resulting bath is 4.9, and when commonly practiced plating conditions are employed, as in plaintiff's *inter partes* tests 4A and 4B, an excellent, ductile, smooth, yellow gold deposit is obtained. The concentration of ammonium citrate in the substituted Underwood bath is about the same concentration as is found in plaintiff's E-55 bath, and the pH of the former bath is only slightly more acid than that of E-55. In other words, when you substitute an equal weight of ammonium citrate for the sodium cyanide mentioned in the Underwood article, you get plaintiff's E-55 bath for all practical purposes (except for the use of potassium gold cyanide in plaintiff's bath instead of Underwood's sodium gold cyanide, the two products having long been known in the art as equivalent substances). Since plaintiff's bath is the chemical equivalent of the patented product when citric acid is used, it follows that the Underwood article, taken in conjunction with the McCullough patent, is prior art over defendant's patent, rendering the latter invalid. The court does not find persuasive defendant's attempts to distinguish McCullough. The fact that McCullough employs anode corrosion is not material since it is well known in the art that the bath can be readily replenished with the metal to be plated by

adding more of the metal salt to the plating solution, as both plaintiff and defendant do. Further, the court does not think that it is plaintiff's burden to show that McCullough, when he mentioned ammonium citrate, meant the dibasic ammonium citrate used by plaintiff rather than the neutral triammonium citrate, since the dibasic is the more common form and is the ordinary ammonium citrate of commerce.

Plaintiff's reliance on the Lukens United States Reissue Patent No. 20,306 as further prior art is misplaced. To demonstrate the relevancy of Lukens, plaintiff substituted ammonium citrate for the sodium cyanide in the alkaline bath mentioned in the Lukens patent, the same as it did with the Underwood solution, and obtained a good plating bath with an acid pH. But the substitution of ammonium citrate is not taught by Lukens; this substitution is merely the teaching of McCullough used in another alkaline cyanide bath, and adds nothing to the tests which used the substituted Underwood bath. The Lukens invention deals with the gold plating of a chromium alloy steel. It employs concentrated hydrochloric acid (which is not a weak, stable, organic acid) and a cyanide in order to form hydrocyanic acid, which inhibits the reformation of an oxide film on the surface of the alloy, a problem that had plagued the art. After one coating is obtained by this acid bath, Lukens prefers to add a second coating by using a common alkaline cyanide bath. The Lukens invention is a specialized and rather dangerous bath because of the presence of toxic hydrocyanic fumes, and in no way anticipates defendant's product.

The court finds that the last two patents relied upon by plaintiff do not constitute prior art. Volk, United States Patent No. 2,812,299, deals with a bath consisting essentially of an aqueous solution of an alkali metal-gold-cyanide complex and at least one buffer substance adapted to maintain a pH of 6.5–7.5 during deposition. The preferred buffer substance is a primary phosphate and particularly an alkali metal, alkaline earth metal or ammonium primary phosphate. Ammonium citrate is a buffer substance but all of Volk's 16 claims require that the bath be operated at a pH of 6.5 to 7.5 which is in the neutral range and is a higher pH than plaintiff's or defendant's bath.

United States Patent No. 2,978,390 to Atwater describes a bath consisting of sodium or potassium gold cyanide and phosphoric or fluoboric acid which is filtered after being allowed to stand for 48 hours. It is operated at a pH of 1.8 and a temperature of 10°C., which requires refrigeration for the purpose of preventing decomposition of the solution and the subsequent liberation of hydrogen cyanide (hydrocyanic acid). Phosphoric and fluoboric acids are inorganic acids. Atwater is inapposite to defendant's bath.

Having found claims 1, 2, 5, 6, 12 and 14 of defendant's patent invalid for failure to describe the best mode for practicing the claimed invention, and for lack of invention over Cowper and over the Underwood article read in conjunction with McCullough, the problem of infringement need not be considered. Corning Glass Works v. Anchor Hocking Glass Corp., 253 F.Supp. 461 (D.Del. 1966); Lugash v. Santa Anita Manufacturing Corp., 254 F.Supp. 96 (S.D. Cal.1965).

This opinion shall serve as the court's findings of fact and conclusions of law. Fed.Rules Civ.Proc. 52(a).

Let an appropriate order be submitted.