**CORNING GLASS WORKS,**
Appellant in No. 15923,

v.

**ANCHOR HOCKING GLASS CORPORA-
TION,** Appellant in No. 15924.

Nos. 15923, 15924.

United States Court of Appeals
Third Circuit.

Argued Oct. 20, 1967.

Decided March 20, 1967.

W. Philip Churchill, New York City,
(Albert E. Fey, Lars I. Kulleseid, Fish,
Richardson & Neave, New York City,
Clair John Killoran, Killoran & Van
Brunt, Wilmington, Del., Clarence R.
Patty, Jr., Clinton S. Janes, Jr., Corning,
N. Y., on the brief), for plaintiff, Cor-
ning Glass Works.

Arthur G. Connolly, Wilmington, Del.,
(Connolly, Bove & Lodge, James M. Mul-
ligan, Jr., John D. Fairchild, William J.
Wier, Jr., Connolly, Bove & Lodge, Wil-
mington, Del., Edmund P. Wood, Rich-
ard H. Evans, Bruce Tittel, Wood, Her-
ron & Evans, Cincinnati, Ohio, Jack D.
Voss, Lancaster, Ohio, on the brief), for
defendant, Anchor Hocking Glass Corp.

Before MARIS, McLAUGHLIN and KALODNER, Circuit Judges.

## OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit Judge.

On November 8, 1963, plaintiff, Corning Glass Works, filed a complaint charging defendant, Anchor Hocking Glass Corporation, with infringement of both product and process claims of its Stookey patent.[1] In answer, defendant denied the infringement charge and further asserted that plaintiff's patent was invalid because: 1) of indefiniteness, 2) the method claims covered inoperative species, and 3) the claims were not patentable over the prior art. Defendant also charged unenforceability by reason of fraud on the Patent Office and included a declaratory judgment counterclaim. On April 26, 1965 defendant amended its answer and counterclaim. The amended answer was directed at a charge of misuse in connection with plaintiff's alleged unlawful fair trading of its product "Corning Ware".[2] The additional two counts to the counterclaim alleged an anti-trust violation and unfair competition with both these charges resting on the contention that plaintiff obtained its patent by intentional fraudulent misrepresentation.

The case was brought to trial in the United States District Court for the District of Delaware before Chief Judge Caleb M. Wright. As set out by the District Court, the issues to be decided were: the validity of the patent, the allegations of fraud and the question of infringement. Counts two and three of defendant's amended counterclaim were dismissed by the court's final judgment of March 29, 1966 and the charge of misuse contained in the amended answer was deferred to a future time.

In his opinion, Corning Glass Works v. Anchor Hocking Glass Corp., 253 F. Supp. 461 (D.Del.1966), Judge Wright found in favor of the plaintiff on the question of fraud and further that the doctrine of unclean hands was not applicable to the facts in the case. On the allegations of invalidity, the court found that plaintiff's invention was patentable over the prior art and that defendant "failed to make even a prima facie showing of inoperativeness", i. e., that the claims of the patent were too broad. In dealing with defendant's charge that the patent was invalid on the ground that its claims were indefinite and vague, the court was satisfied that the claim language was definite. However, the court found that the patent was unenforceable " * * * because in 1956, when the application was made, and in 1960, when the patent issued, to determine the percent crystallinity within this 7 to 10% margin of error required costly and lengthy independent experimentation to devise a test to ascertain whether a product was within the bounds of the patent claims." 253 F.Supp. 461 at 479.

### THE STOOKEY PATENT

The patent in suit was the development of Dr. Stanley Donald Stookey, the present Director of Fundamental Chemical Research at the Corning Glass Works. Dr. Stookey's patent teaches the devitrification or crystallization of glass into a glass ceramic material called Pyroceram. Starting with a glass the process initiates a change so that the end product no longer has the properties of glass but rather crystalline properties.

Glass by its nature is a super cooled liquid which at a high temperature has an amorphous molecular structure unlike the ordered structure of a crystalline material. As the glass is cooled it becomes viscous until it reaches its final rigidity where it has the same molecular structure it possessed as a liquid. A pure transparent glass will not contain any crystals because its molecular structure is not receptive to crystallization. However, if at some point prior to or during the cooling

---

1. Patent No. 2,920,971. Application for the patent was made on June 4, 1956 and the patent issued on January 12, 1960.

2. Trade name given to plaintiff's line of domestic cookware covered by the patent in suit.

phase small particles or imperfections are introduced, crystallization will occur. These microscopic particles are called nuclei and these nuclei initiate the growth of crystals.

In the manufacturing process of glass, nucleation is synonymous with imperfection, because the area that is crystallized has different properties than the rest of the glass which will weaken the glass to the breaking point or cause undesired opaqueness. Through the discovery of Dr. Stookey, however, the nuclei are artificially introduced so that their production and number are controlled independently of the crystallization of the main body of glass. In the words of Dr. Stookey, "[t]he effect of producing these billions of nuclei throughout the body, the nuclei being such small particles that they can't be seen except perhaps by the electron miscroscope—they are too small to see with the ordinary optical microscope—but each one of those billions has a similar effect herein producing eventually after heat treatment an individual crystal, and the difference there is that without very much heat treatment each of these crystals grows until it comes into contact with the other crystals growing along with it until finally the material is all crystalline, or essentially all crystalline."

Corning's patent teaches that glass can be converted to a predominately crystalline or semicrystalline ceramic body having " * * * at least 50% by weight * * * of crystallizable glassmaking ingredients, * * *."[3] To identify and determine the quantity of crystals the patent suggests the use of a " * * * conventional X-ray powder spectrometer or diffractometer, equipped with a Geiger counter and a curve—or trace—drawing device, * * *."[4] It

was precisely the percent crystallinity and the method measuring that percentage that became the focal point of the District Court's determination to invalidate plaintiff's patent.

The Stookey patent was charged by the defendant to be invalid for vagueness since independent experimentation was required to determine: 1) whether a given glass formula will make a pyroceram, 2) the size of the resulting crystals and whether they interlock and 3) percent crystallinity. Before passing upon defendant's assertions, however, the court deemed it necessary to deal with the preliminary issue of whether the 50% crystallinity criterion was definite within the meaning of 35 U.S.C.A. § 112.

Finding that the claim language (50% crystallinity) was definite the District Judge turned to consider whether the limits of the patent were indefinite by the standards of 35 U.S.C.A. § 112. The problem of construing the patent's limitations was further complicated by the existence of a 7 to 10% margin of error in measuring percent crystallinity by X-ray diffraction.[5] Thus, the court's basic question was rephrased to discover "whether this 7 to 10% margin of error in determining percent crystallinity is so great as to make the patent claims indefinite with 35 U.S.C.A. § 112." 253 F.Supp. 461 at 478.

The court set forth three standards upon which the doctrine of indefiniteness rests: 1) protection of the patentee, 2) the encouragement of the inventive genius of others and 3) the assurance that the subject of the patent will be dedicated ultimately to the public.[6] In light of these standards the court was satisfied that the margin of error was not so large as to be indefinite. The court concluded that where a margin of error does exist

---

3. Patent No. 2,920,971, claim #1.

4. Patent No. 2,920,971.

5. There was a dispute between the parties as to whether the court should determine the standards and tests at the time the patent application was made or from the date the patent issued. The court, however, found it unnecessary to resolve the

problem because the same 7 to 10% margin of error existed at the time of application and the time of issue.

6. These three standards were established by the Supreme Court in the case of General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369, 58 S.Ct. 899, 82 L.Ed. 1402 (1938).

in a measuring technique the court should interpret the claims " * * * as narrowly as possible when considering the patentee's protection, * * * and interpreting them broadly when considering the public dedication * * *." 253 F.Supp. 461 at 479. By way of illustration the court pointed out that " * * if a competitor produced a product which, on measurement by X-ray diffraction showed 59% crystallinity, it would be entitled to a judgment of noninfringement because within the limits of measurement preciseness of 10% error it is possible that the competitor's product is only 49% crystalline; consequently it falls outside the claim limits of the patent. Thus the patentee is protected although his protection may be more limited than he desires." 253 F.Supp. 461 at 478, 479.

Even though the claims were found to be definite under 35 U.S.C.A. § 112 the District Court declared the patent unenforceable " * * * because in 1956, when the application was made, and in 1960, when the patent issued, to determine the percent crystallinity within this 7 to 10% margin of error required costly and lengthy independent exprimentation to devise a test to ascertain whether a product was within the bounds of the patent claims." 253 F.Supp. 461 at 479. In support of its ruling the District Court relies on the Third Circuit case of Standard Oil Co. of California v. Tide Water Associated Oil Co., 154 F.2d 579 (3 Cir. 1946), which held at p. 583 that " * * no inventor may compel independent experimentation by others to ascertain the bounds of his claims." This language was framed by the District Court to encompass the exigencies of the present situation, i. e., that "[a] patentee cannot foist a great financial burden on another to develop a new measurement technique to determine whether he is infringing the patent." 253 F.Supp. 461 at 479. In the opinion of the court Anchor's efforts to determine percent crystallinity within a 7 to 10% range of error involved such an expenditure of funds, with both their own experimentation and in their consultation with others, as to constitute a "great financial burden" and thus render Corning's patent unenforceable.

## MEASUREMENT OF PERCENT CRYSTALLINITY

In our view the District Court erred in finding Corning's patent to be unenforceable, since the standards placed upon this particular patent were, as a matter of law, too strict.

The District Court held that the Corning patent is " * * * a basic and pioneering advance in glass and ceramic technology." 253 F.Supp. 461 at 465. We believe that Dr. Stookey's discovery is, in every sense of the word, a "pioneer" —" * * * a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before." Westinghouse v. Boyden Power Brake Co., 170 U.S. 537 at 561, 562, 18 S.Ct. 707, at 718, 42 L.Ed. 1136 (1898). Where the court is confronted with such a pioneer patent liberality becomes the keynote of construction requiring the court to give the patentee a wide breadth of protection in construing the patent claims and specifications, Sessions v. Romadka, 145 U.S. 29, 12 S.Ct. 799, 36 L.Ed. 609 (1892); Consolidated Window Glass Co. v. Window Glass Mach. Co., 261 F. 362 (3 Cir. 1919), cert. den. 251 U.S. 558, 40 S.Ct. 179, 64 L.Ed. 413 (1920); Etten v. Kauffman, 121 F.2d 137 (3 Cir. 1941).

Until the development of Pyroceram by Dr. Stookey crystallized glass accounted for only a fraction of the total world glass production.[7] Glasses that were intentionally crystallized were opal (light-diffusing) glasses which contained at most 10% crystallinity. The only crystallized composition which approached the 50% requirement was a process invented by Dr. Stookey himself called Fotoform. The crystallinity of this process ranges

---

7. Dr. Stookey testified that " * * * about 99 per cent of all glass that is made in the world is completely transparent and free of crystals."

somewhere between 24 and 35 percent. The success of Pyroceram ushered in a new era in the field of crystallized glass and glass ceramics. Dr. Stookey's discovery was found to possess properties which set it apart from any prior development in the art. Pyroceram's thermal, abrasive and dielectric features made it particularly adaptable to a wide variety of commercial applications—from cooking ware to guided missiles and deep sea diving vessels.

Section 112, 35 U.S.C.A. is designed to protect the patentee and encourage experimentation in the area not covered by the patent. The courts are required to reconcile these conflicting concepts but as this court pointed out in Jones Knitting Corporation v. Morgan, 361 F.2d 451, 454 (3 Cir. 1966), " * * * each case presents a different question, and the rule is not a technical one, but one made to protect the public." With this in mind it should be noted that the law provides guidelines to aid the court in balancing these concepts. Where the art is crowded the claims must be certain and definite enough to distinguish the patent from prior discoveries, Barkeij v. Lockheed Aircraft Corp., 210 F.2d 1 (9 Cir. 1954). Where the patent is a pioneer in the art the necessity to distinguish previous inventions is not as demanding, but a sufficiently precise description is still required to " * * * clearly circumscribe what is foreclosed from future enterprise." United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236, 63 S.Ct. 165, 170, 87 L.Ed. 232 (1942).

The important problem before us is whether Corning's patent lacked such precision in description as to compel " * * * costly and lengthy independent experimentation to devise a test to ascertain whether a product was within the bounds of the patent claims." 253 F.Supp. 461 at 479. To phrase the question more precisely under the corollary test of the District Court, the patent's invalidity rises and falls with the evaluation of whether Corning foisted a great financial burden upon Anchor " * * *

to develop a new measurement technique to determine whether he [Anchor] is infringing the patent." 253 F.Supp. 461 at 479. For the reasons that follow we believe the question must be answered in the negative.

The Corning patent teaches that its process results in a composition which contains 50% crystallinity by weight. In order to measure the weight percentage crystallinity the patent refers to the use of the X-ray diffraction method. The District Court indicated that Corning, in 1956 and in 1958, was unable to measure the percent crystallinity within the 7 to 10% range of error by X-ray diffraction. It was not until 1964, after a year of independent experimentation, that plaintiff refined its X-ray diffraction technique down to a 4 to 5% margin of error. Because of the uncertainty of the X-ray diffraction method defendant was forced to spend time and money in the development of its own testing methods and this in the opinion of the District Court invalidates the patent. Juxtaposed against the narrow interpretation of the patentee's claims the result reached by the District Judge was inevitable. Once, however, the District Court's cloak of strictness has been removed, and the broad construction due this pioneer patent is applied, it becomes evident that Anchor was not under any burden in determining whether or not it was infringing plaintiff's patent.

In interpreting the claims and specifications the District Court relied too heavily on the 50% crystallinity standard set forth in the patent. In his own words Dr. Stookey stated that the process he invented was designed to convert glass " * * * to something that has not the properties of glass basically but the properties of crystals." The first paragraph of the patent explains that the process is concerned with changing preformed glass articles " * * * to predominantly crystalline or semicrystalline ceramic bodies * * *." It is quite apparent that the designation of 50% crystallinity was an effort to describe the conversion of a glass to a predominantly crystalline

body and not an arbitrary point at which the patentee wished to assert a monopoly. On cross-examination Dr. Stookey clearly stated the purpose of his invention:

"To my mind and certainly the original purpose of the invention whether it is 40 or 45 or 50 or 55 per cent is not critical. The purpose of the invention is to change a glass to a material with substantially different properties, predominantly crystalline, and for that reason I don't consider that any one particular percentage makes any sharp dividing line.

\* \* \* \* \* \*

"There is this gray area in which any of the properties may be changing, but it is not possible to set one particular percentage, like 49 per cent, as the dividing line between a crystal and a glass. But all of the glasses that have been known to me from the past have been glass with perhaps a maximum of 10 to 15 per cent of crystals.

"I mentioned my own invention of FOTOFORM in which after heating to the etching stage, there was about 24 percent to 35 per cent crystals. This is the only example of a glass that I know of that had that much crystallinity. So I am distinguishing between the two ends of the scale really and doing my best in the patent to describe this."

■■■ The District Court noted that "[t]he change in properties begins at approximately 40% crystallinity and in most cases is complete at 60%." 253 F. Supp. 461 at 479. Since a patentee is under no obligation to claim the limits of his invention that portion of plaintiff's patent between 40 and 50% crystallinity was considered by the court to be dedicated to the public. However, the testimony of Dr. Stookey demonstrated that no such public surrender was intended by Corning. The law is settled that a patent should not be struck down or its claims unnecessarily limited where a reasonable construction of the specifications and claims will protect the invention, 4 Deller's Walker on Patents, Sec. 242, p. 118 (2d ed. 1965). If such a construction is applied in this case the Stookey patent's sphere of protection will extend to 40% crystallinity. Nor would giving the plaintiff a patent monopoly in the area of 40% crystallinity violate the provisions of 35 U.S.C.A. § 112 because as previously stated, the 50% crystallinity standard must be read in the light of the patent's overall purpose, which is to convert preformed glass articles to predominantly crystalline or semicrystalline ceramic bodies. In dealing with Section 112 the Second Circuit stated in Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124 (2 Cir. 1958), cert. den., 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958):

"On the other hand, patentable inventions cannot always be described in terms of exact measurements, symbols and formulae, and the applicant necessarily must use the meager tools provided by language, tools which admittedly lack exactitude and precision. If the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more." 258 F.2d 124 at 136.

Examining the District Court's narrowly interpreted conclusion in a more favorable posture toward the patentee it is clear that Anchor was not unduly burdened in establishing the bounds of the Corning patent. The opinion of the District Judge explained that in 1958 Corning was unable to determine percent crystallinity by X-ray diffraction or electron microscopy, although, the court conceded, " \* \* \* it was possible to determine this percentage roughly by chemical analysis." 253 F.Supp. 461 at 480. The chemical analysis test, though not set forth in plaintiff's patent as a means of measuring percent crystallinity, was, nevertheless, a common and inexpensive method available to Anchor to determine the limits of the Stookey patent. Quantitative measurement by chemical analysis is a first principle of any scientific investigation and its employment, if not ex-

plicit, would certainly be implied. Further, the X-ray diffraction test was by no means lacking as a method of calculating the patent claims. The testimony of Anchor's own witness, Dr. Rustum Roy, showed that in 1956 percent crystallinity could be determined with considerable accuracy. The testimony read:

"Q. Do you think, Dr. Roy, that you personally would have been unable to determine the weight percentage of spodumene crystals in one of these products in 1956 so that your results were no more accurate than plus or minus 10 per cent using the best techniques and intelligence, and so on, that you had? A. I would give myself about 8 per cent maybe.

Q. You think you might do just a little bit better? A. Just a little."

The evidence indicates that defendant could adequately measure the patent claims and that the "great financial burden" was not foisted upon but rather assumed by Anchor in an effort to distinguish or break the Stookey patent— not to determine its limits. In a letter of March 21, 1960 to Dr. W. A. Weyl of Pennsylvania State College, Paul D. Dilliard, the Technical Director of Practical Research at Anchor, acknowledged that defendant's developments would infringe on Corning's patent rights [8] and Dr. Dilliard testified to this fact in his deposition.[9]

█ From the facts and circumstances concerning this invention and under the sound law of the case the only reasonable conclusion is that the patent was sufficiently described so that those who are skilled in the art were apprised of the patent claims and specifications without being forced to engage in costly independent experimentation.

We have examined at length the contentions of the appellee cross-appellant concerning other alleged sources of indefiniteness in the Stookey patent not specifically dealt within the opinion below, alleged fraud on the Patent Office by appellant and alleged invalidity of the Stookey patent over the prior art. We find all of these to be without merit. It remains to be said that the patent here found valid is a great basic invention which has brought substantial benefit to the public at large.

The judgment of the District Court dismissing the complaint and granting the declaratory judgment sought by Count 1 of the defendant's counterclaim and declaring invalid each and every claim of U. S. Patent No. 2,290,971 will be reversed and this cause will be remanded to the District Court with direction to enter judgment in favor of plaintiff-appellant. The dismissal by the District Court of Counts 2 and 3 of defendant's counterclaim will be affirmed. The question of infringement by defendant of plaintiff's patent which quite properly under the trial decisional circumstances was not passed upon by the District Court, will be remanded to that Court for its consideration.

8. The pertinent part of the letter reads: "As you will note from this patent the process is such that our own developments would infringe on the patent rights. It is our present understanding from our patent attorney that if it can be shown that either all or part of the claims in this patent have been known or practiced prior to the patent application, there is a possibility of breaking the patent. It is also our understanding that the major key or claim in this patent is the fact that the resulting product is 50% or more crystal. It is these two points which we need to resolve before decisions can be made as to the present standing of our development."

9. "Q. Now, the letter you wrote Dr. Weyl goes on to state, 'As you will note from this patent the process is such that our own developments would infringe on the patent rights.' Were they referring to the Stookey patent here in suit? A. That is right, yes.

Q. And was that your understanding of the situation at that time? A. That is correct."