**CORNING GLASS WORKS, Plaintiff,**

v.

**ANCHOR HOCKING GLASS CORPO-
RATION, Defendant.**

**Civ. A. No. 2763.**

United States District Court
D. Delaware.

July 15, 1969.

Clair John Killoran, of Killoran & Van
Brunt, Wilmington, Del., for plaintiff,
W. Philip Churchill, Albert E. Fey and
Lars I. Kulleseid, of Fish, Richardson
& Neave, New York City, Clarence R.
Patty, Jr., and Clinton S. Janes, Jr.,
Corning, N. Y., Corning Glass Works,
of counsel.

Arthur G. Connolly, James M. Mulli-
gan, Jr., John D. Fairchild and William
J. Wier, Jr., of Connolly, Bove & Lodge,
Wilmington, Del., for defendant, Ed-
mund P. Wood, Richard H. Evans and
Bruce Tittel, of Wood, Herron & Evans,
Cincinnati, Ohio, and Jack D. Voss,
Lancaster, Ohio, Anchor Hocking Glass
Corp., of counsel.

### FINDINGS OF FACT
### and
### CONCLUSIONS OF LAW

CALEB M. WRIGHT, Chief Judge.

This patent infringement action hav-
ing been tried upon the facts by the
Court without a jury, and the Court
having heard the evidence and examined
the record and exhibits in evidence, the
Court makes the following findings of
fact and conclusions of law on the issue
of infringement:

### FINDINGS OF FACT

1. Plaintiff, Corning Glass Works, is
a New York corporation, having its of-
fice and principal place of business in
Corning, New York; and defendant,
Anchor Hocking Glass Corporation, is a
Delaware corporation, and a citizen and
resident of the District of Delaware.

2. The Complaint was filed Novem-
ber 8, 1963, charging defendant with in-
fringement of Stookey patent No. 2,920,-
971, which issued to plaintiff January 12,
1960, and is still owned by plaintiff.
Plaintiff relies on product claims 12–15
and 19–21 and on method claims 1–3,
5 and 9–11 of its patent in suit; product
claims 12 and 21 and method claim 5
are typical. Infringement of the patent
in suit is alleged to arise out of defend-
ant's manufacture and sale from July,
1963 of its RP–31 COOKWARE, and by

manufacture and sale from March, 1965 of its ZTS–3 COOKWARE.

3. There is no dispute as to jurisdiction and venue of the original action which is based upon 28 U.S.C. §§ 1338(a) and 1400(b); there is no dispute about ownership of the patent in suit; and the validity of the patent is no longer in issue. See Corning Glass Works v. Anchor Hocking Glass Corp., 374 F.2d 473 (3rd Cir. 1967).

4. Product claims 12 and 21 of the patent in suit[1] are typical. These product claims specify ceramic bodies consisting essentially of a great number of small interlocked inorganic crystals formed in situ and dispersed in a glassy matrix. The size of the crystals is specified as of the order of 0.1–20 microns in diameter and the amount of crystals required to establish the unique crystalline properties is at least 40|% (and in most cases not more than 60|%) by weight of the product. Corning Glass Works v. Anchor Hocking Glass Corp., 374 F.2d 473, 477–478 (3rd Cir. 1967). In addition, claim 21 defines the oxide composition of the body as made up at least 90% by weight of $SiO_2$, $Al_2O_3$, 2–20% $TiO_2$ and one or more of certain designated basic metal oxides listed in the patent at column 5, lines 55–7.

Method claim 5 of the patent[2] defines the method of making such predominantly crystalline glass-ceramic products by a controlled crystallization including the four steps of:

(1) melting a glass-making composition having the oxide analysis specified above,

(2) cooling this melt to form a glass, i. e., without crystallization,

(3) exposing this glass to a temperature above the annealing temperature of the glass but below its maximum nucleation temperature for a substantial period of time, and

(4) increasing the temperature of the glass to a higher temperature at which crystals are formed on the nuclei developed in step 3, and holding the glass at this higher temperature until the product is 40%–60% or more crystalline. Corning Glass Works v. Anchor Hocking Glass Corp., supra at 477–478.

One of the basic features of the Stookey invention is the formation of the right kind of glass (which can be melted, formed and shaped according to known glass working techniques), heating the formed glass articles to a temperature at which large quantities of very small nuclei are formed (without crystals) throughout the glass body and only then increasing the temperature to allow crystals to grow on these prepared sites or nuclei. It is only by following this sequence of steps with a glass containing a suitable nucleating agent that an exceedingly large number of very small crystals can be formed uniformly distributed throughout the body of the article to give the article its unique properties and that uncontrolled, spontaneous crystallization—the old objectionable devitrification of the glass—can be avoided.

5. Defendant alleges that the x-ray diffraction and chemical extraction tests applied by plaintiff to establish the percent crystallinity of defendant's products are plagued with a variety of errors which are not eliminated by plaintiff's proofs of infringement, so that plaintiff has not established satisfactorily that defendant's products meet the 40%–60% crystallinity requirement. However, the Court of Appeals, 374 F.2d at 478–479, has specifically ruled that these tests are sufficiently precise to permit adequate measurement of percent crystallinity and the actual test data placed into evidence by plaintiff,[3] particularly when compared with data from more modern, reliable techniques (e. g. electron microscope micrography),[4] confirms the valid-

1. PX–1; PX–2.

2. PX–1; PX–2.

3. Tr. 1172, 1220, 1278, 1296–97, 2647–48, 2648–52, 2724–25, 2890–91.

4. Tr. 937, 1000, 1472.

ity and usefulness of these tests in determining infringement.

Defendant also alleges that the term "interlocked crystals" used in the patent requires that plaintiff show a crystal relationship such as that which exists between pieces of a jigsaw puzzle or clasped hands in order to establish infringement, something which plaintiff has not done. While the term "interlocked crystals" may encompass the relationships suggested by defendant, it also encompasses the relationship intended by the inventor, Dr. Stookey, namely, where "crystals [are] surrounded by other small crystals and essentially trapped or in contact with all of these surrounding crystals in such a manner as would be expected that these crystals start from nuclei that [are] uniformly disposed through the glass. * * * " [5] Accordingly, plaintiff need not show the crystal relationship suggested by defendant to establish infringement. Defendant also alleges that plaintiff's patent is bottomed on the theory of "heterogeneous nucleation" (also called "heterogeneous crystallization") and that plaintiff must establish that defendant's accused products are produced by such a mechanism in order to show infringement, something which plaintiff allegedly has not done. However, the theory of heterogeneous nucleation is no part of the patent claims in issue and reliance on that theory was specifically withdrawn prior to the issuance of the patent.[6] Accordingly, plaintiff need not prove that defendant's products are produced by heterogeneous nucleation to prove infringement.

6. Commencing in June 1963, defendant has manufactured, and commencing July 27, 1963, defendant has sold, its RP–31 glass-ceramic cooking vessels, such as skillets and sauce pans, under defendant's trademark COOKWARE. The chemical oxide analysis of defendant's accused COOKWARE as analyzed by plaintiff and as analyzed by defendant is as follows, and there is no significant difference between these two analyses:

|  | As analyzed by plaintiff | As analyzed by defendant |
|---|---|---|
| $SiO_2$ | 62.2 | 62.98 |
| $Al_2O_3$ | 20.14 | 19.76 |
| $B_2O_3$ | 5.21 | 5.65 |
| $TiO_2$ | 3.62 | 3.58 |
| $MgO$ | 3.17 | 3.49 |
| $Li_2O$ | 3.14 | 3.00 |
| $ZrO_2$ | 0.8 | 0.6 |
| $CaO$ | 0.12 | less than 0.1 |
| $Na_2O$ | 0.5 | 0.52 |
| $K_2O$ | 0.24 | 0.14 |
| $Fe_2O_3$ | 0.044 | 0.056 |
| $As_2O_3$ | 0.53 | 0.34 |
|  | 99.71 | 100.22 |

This product contains by weight more than 90% of silica, alumina, titania, lithia and magnesia, and the amount of titania is within the range of 2 to 20% of the composition.[7]

7. Shortly before trial, in March, 1965, defendant's counsel advised plaintiff's counsel that defendant had offered on the market a new COOKWARE product referred to by defendant as ZTS–3, the first continuous manufacture of which would take place in April, 1965. It was also stated that defendant's intention was to convert its operations to the new product but that defendant was not abandoning the old formulation. Six samples typical of the new COOKWARE in finished form and six typical samples in the green glass state were forwarded by defendant to plaintiff on April 7, 1965. The oxide analyses of this new

5. Tr. 583–84. The testimony of Dr. Yoder, Tr. 1827–28, 1864–65, that the term "interlocked crystals" requires a jigsaw puzzle or clasped hand relationship is not persuasive.

6. PX–2 (pp. 83, 87–89).

7. Pretrial Order (p. 7, ¶ (c) (6)).

product by plaintiff and defendant are as follows:[8]

|        | By defendant | By plaintiff |
|--------|--------------|--------------|
| $SiO_2$ | 63.16 | 63.38 |
| $B_2O_3$ | 3.40 | 3.04 |
| $Fe_2O_3$ | .04 | .04 |
| $TiO_2$ | .97 | 1.00 |
| $Al_2O_3$ | 20.69 | 21.25 |
| CaO | .02 | .28 |
| MgO | 3.19 | 3.11 |
| $Na_2O$ | .64 | .52 |
| $K_2O$ | .16 | .23 |
| $As_2O_3$ | 1.28 | .97 |
| $Li_2O$ | 3.46 | 3.25 |
| $ZrO_2$ | 2.00 | 2.53 |
| $SnO_2$ | .99 | .51 |
| $P_2O_5$ | . . . . . | .29 |

Defendant's ZTS–3 COOKWARE is generally the same as its RP–31 COOKWARE. The only important difference between the two products, for purposes of this litigation, is that the nucleating agents in RP–31 COOKWARE are about 3.6% $TiO_2$ plus about .6% $ZrO_2$, whereas the nucleating agents in ZTS–3 COOKWARE are about 1% $TiO_2$, about 2% $ZrO_2$ and about 1% $SnO_2$.[9]

8. Defendant's RP–31 COOKWARE is a ceramic body consisting essentially of a multiplicity of interlocked inorganic crystals dispersed in a glassy matrix which are formed by crystallization in situ from a glass consisting essentially of inorganic compounds.[10] The crystals are substantially all on the order of 0.1–20 microns in diameter,[11] and constitute more than 40% by weight of the product.[12] The principal crystalline phase of beta spodumene-silica solid solution crystals alone constitute more than 60%

by weight of the product,[13] and average about 1 micron in diameter.[14]

Defendant's RP–31 COOKWARE directly and literally satisfies every requirement of each of claims 12 and 21, the broadest and most specific claims, respectively, of the Stookey patent 2,920,-971 in suit. RP–31 COOKWARE is a direct and literal infringement of these product claims.

9. Defendant's ZTS–3 COOKWARE is a ceramic body consisting essentially of a multiplicity of interlocked inorganic crystals dispersed in a glassy matrix which are formed by crystallization in situ from a glass consisting essentially of inorganic compounds.[15] The crystals are substantially all on the order of 0.1–20 microns in diameter[16] and constitute more than 40% of the product by weight.[17] The principal crystalline phase of the beta spodumene-silica solid solution crystals alone constitute more than 60% by weight of the product,[18] and average about 1 micron in diameter.[19]

Defendant's ZTS–3 COOKWARE directly and literally satisfies every requirement of product claim 12 of Stookey patent 2,920,971 in suit. ZTS–3 COOKWARE is a direct and literal infringement of claim 12.

10. The total of $SiO_2$, $Al_2O_3$, $TiO_2$, and the basic metal oxides CaO, MgO, and $Li_2O$ is in excess of 90% in defendant's ZTS–3 COOKWARE, and this product escapes direct and literal infringement of specific product claim 21 only in that its $TiO_2$ content is less than the 2–20% limits specified by the claim. Instead, the nucleating agents in ZTS–3 COOKWARE are about 1% $TiO_2$, about 2% $ZrO_2$, and about 1% $SnO_2$.[20] With the

8. Pretrial Order (pp. 8–9, ¶ (c) (8)).

9. Tr. 1532–35, 1539–50; note 8, supra.

10. Tr. 1218–19, 1694, 1696; see note 5, supra.

11. Tr. 980–81, 1463.

12. Tr. 936–37, 1172–73, 1220, 1278, 1296–97, 2647–52, 2724–25, 2890–91.

13. See note 12, supra.

14. Tr. 980–81.

15. See Finding of Fact 7, supra; note 10, supra.

16. Tr. 1001, 1472–73.

17. Tr. 1000, 1472.

18. Tr. 1297.

19. Tr. 1472–73.

20. See Finding of Fact 7, supra; note 9, supra.

use of the combination of these nucleating agents, titanium, zirconium and tin appear in the nuclei of ZTS–3 COOKWARE in the same way that titanium appears in the nuclei of glass-ceramic products nucleated by $TiO_2$ alone; and these nuclei in ZTS–3 are responsible for the crystallization of the product in the same way as are the nuclei in glass-ceramics nucleated by titania alone. The combination of these nucleating agents acts, in the nucleation and crystallization of ZTS–3 COOKWARE, in substantially the same way as would a larger amount of $TiO_2$ alone, to produce substantially the same result—a highly crystalline fine-grained ceramic product.[21]

The combination of about 1% $TiO_2$, about 2% $ZrO_2$, and about 1% $SnO_2$, as nucleating agents in ZTS–3 COOKWARE, is the equivalent of more than 2% of $TiO_2$ alone as a nucleating agent, and ZTS–3 COOKWARE is an infringement in fact of claim 21 of the patent in suit.

11. Defendant's RP–31 COOKWARE is a ceramic product manufactured from a batch of glass-making materials as described in Finding No. 6 which is first melted, and then formed into shaped articles and cooled to transparent glass ware. They are subsequently converted by heat treatment to an opaque crystallized ceramic.[22]

The heat treatment given defendant's RP–31 COOKWARE to convert it from glass to ceramic is as follows: the ware is brought to 1150°F. in 2½ hours; then its temperature is raised at a rate of 100°F. per hour to 1700°F. in a period of 5½ hours; and the ware is thereafter cooled. This heat treatment amounts to heating the ware rapidly to about its annealing temperature of 1156–1200°F., and thereafter heating it slowly to its crystallization temperature. During this slow heating above the annealing temperature, the ware is above the annealing temperature but below the maximum nucleation temperature for a time greatly in excess of 1 minute. The final temperature of 1700°F. is a temperature at which the glass-making ingredients in the product crystallize but below the temperature at which the predominant crystalline phase redissolves, and the product is maintained at or about that temperature for a time sufficient to obtain a product which is substantially more than 40% crystalline.[23]

The method by which defendant's RP–31 COOKWARE is manufactured directly and literally satisfies every requirement of each step of typical method claim 5 of the Stookey patent 2,920,971 in suit; and its composition directly and literally satisfies every requirement of that claim concerning the composition of the glass-making batch upon which the method steps are performed. Defendant's manufacture of RP–31 COOKWARE is an infringement of typical method claim 5 of the Stookey patent.

12. Defendant's ZTS–3 COOKWARE is a ceramic product manufactured from a batch of glass-making materials as described in Finding No. 7 which is first melted, and then formed into shaped articles and cooled to transparent glass ware. They are subsequently converted by heat treatment to an opaque crystallized ceramic.[24]

The heat treatment given defendant's ZTS–3 COOKWARE to convert it from glass to ceramic is as follows: The ware is heated to 1300°F. (above its annealing temperature of 1100°F., but below its maximum nucleation temperature), and held at that temperature for 1 hour; its temperature is then raised at 2°F. per minute to a temperature of 1750°F. in a period of over 4½ hours; the ware is then held at 1750°F. for 1 hour, and finally cooled to room temperature. The final temperature of 1750°F. is a temperature at which the glass-making in-

21. Tr. 1485–86, 1488–92, 1502–03, 1539–50.

22. Pretrial Order (p. 7, ¶ (c) (6); p. 9, ¶ (c) (9)).

23. Tr. 1220, 1701–05; note 12, supra.

24. Pretrial Order (pp. 8–9, ¶ (c) (8); p. 9, ¶ (c) (10)).

gredients in the product crystallize but below the temperature at which the predominant crystalline phase redissolves, and the product is maintained at or about that temperature for a time sufficient to obtain a product which is substantially more than 40% crystalline.[25]

13. The method by which defendant's ZTS–3 COOKWARE is manufactured directly and literally satisfies every requirement of each step of typical method claim 5 of Stookey patent 2,920,971 in suit. Its composition also satisfies the requirements of that claim concerning the glass-making batch upon which the method steps are performed, with the exception that it includes less than 2% of $TiO_2$. The nucleating agent in ZTS–3 COOKWARE, a combination of about 1% $TiO_2$, about 2% $ZrO_2$ and 1% $SnO_2$, however, is the equivalent of an amount of $TiO_2$ greater than 2% alone;[26] and, accordingly, defendant's manufacture of ZTS–3 COOKWARE is an infringement of typical method claim 5 of the Stookey patent under the doctrine of equivalents.

14. Application for the Stookey patent in suit was filed June 4, 1956. Plaintiff made a general public announcement of its new PYROCERAM products, and the method of making them, in May, 1957. Experimental work on developing additional PYROCERAM products for commercial applications was continued by plaintiff in 1957 and early 1958. Commencing in the Fall of 1958, plaintiff began to manufacture and sell a line of cooking and serving vessels under its trademark CORNINGWARE. National distribution of this product was achieved in 1959 and in 1960, plaintiff constructed a special plant at Martinsburg, West Virginia with a capacity for making about $40,000,000 worth of CORNING-WARE a year. Sales increased so fast that the Martinsburg plant had to be expanded twice in the next three years.[27]

Commencing in the Fall of 1958, defendant purchased and analyzed plaintiff's CORNINGWARE and during 1959, defendant conducted an extensive series of laboratory experiments (entitled "Pyroceram Progress Reports") to duplicate plaintiff's products and to study many variations of them. Defendant obtained in June, 1959 a copy of the Belgian patent corresponding to the Stookey patent in suit, and a copy of the U. S. patent in suit shortly after it issued January 12, 1960. Since 1959, defendant has conducted an intensive and continuous study to learn all it could about Stookey's glass-ceramics, the prior art and, if possible, how to "beat" plaintiff's patent in suit so that defendant could participate in the market for CORNINGWARE which had been pioneered and developed by plaintiff.[28]

15. From the outset of its activities in the Fall of 1958, defendant has sought to learn all it could about PYROCERAM from plaintiff's patents, by interviews with ex-employees of plaintiff, including Dr. Condon, former Director of Research for plaintiff, and from talks and publications by Dr. Stookey and his assistants. Defendant's Vice President, Herrold, was instructed at an early date "to get into this project, and press it to a conclusion, to provide the facilities necessary and to find out what this crystallized glass was al about".[29] Throughout its work, defendant has been continually advised, first by its patent attorney, Mr. Norman Holland, and later by its attorney Mr. Edmund P. Wood, and defendant was warned by Mr. Wood in early 1961 about the dangers of deliberate infringement.[30]

By the summer of 1961, defendant had developed a composition (called RP–3 in its laboratories) which was felt to be about ready for use in producing cooking and serving dishes to compete with Corning's CORNING WARE. Defend-

25. Tr. 1714; note 17, supra.

26. See Finding of Fact 10, supra.

27. Tr. 697–700, 722–23, 736–37.

28. Tr. 2660–62, 2670–73, 2674–79, 2682, 2685–86, 2735–40, 2742–47, 2769–76, 2808–12, 2855, 2862–63, 2869–72; PX–149.

29. Tr. 2734.

30. Tr. 2730; PX–152.

ant's executives approached plaintiff, requested a license under the patent in suit, and the request for a license was refused.[31] Nevertheless, defendant's executives, at a meeting on September 19, 1961, made a firm decision to go right ahead with the development and marketing of a competing product based on their RP–3 formula.[32] Defendant's President Gushman and Vice President Herrold sought to justify this decision to defy the Stookey patent on the basis of opinions defendant had received from its counsel. Though repeatedly demanded, such opinions have never been produced or offered in evidence, and Mr. Wood indicated on the record that he did not remember the opinion to be exactly as described.[33]

During 1962, defendant went ahead with commercialization experiments and made minor changes in the composition of its RP–3 material, calling the new material RP–31. In August of 1962, defendant's Dilliard reported that the product was ready and that the only problem was that it might be questioned "on a legal basis".[34] Late in 1962, defendant's attorneys consulted with representatives of Owens-Illinois Glass Company, another competitor of plaintiff, to try to find a way to "beat" the Stookey patent in suit.[35] Also, during 1962, defendant did considerable experimental work trying to find a way of making a product with either less than 2% titania or no titania. Some of these products were reported to Mr. Wood as promising, and early in 1963 Mr. Wood advised defendant that they would be a far better risk of infringement than the RP–31 composition.[36] Defendant, nevertheless, went ahead full scale in 1963, and by July began to sell commercially its RP–31 COOKWARE, a product made with about 3.6% titania.

16. Defendant's infringing activities in manufacturing and selling its RP–31 and ZTS–3 COOKWARE were undertaken only after defendant had obtained and analyzed plaintiff's products, and had studied the Stookey patent in suit. Defendant's decision to try to capture some of the CORNING WARE market, developed by plaintiff through its research, was made in spite of defendant's request for a license under the patent in suit, and plaintiff's refusal to grant such a license.[37] In short, defendant has deliberately defied plaintiff's patent, and has assumed the risk of litigation, with a product that was a literal infringement.

In addition, in marketing its RP–31 COOKWARE, defendant deliberately made it in a shape generally the same as plaintiff's CORNING WARE; it used a removable handle as did plaintiff; it used the name COOKWARE which is unnecessarily close to plaintiff's CORNING WARE; it used packaging similar to plaintiff's packaging; and it guaranteed its product in language virtually identical to the language by which CORNING WARE is guaranteed.[38]

Defendant's infringement of Stookey patent 2,920,971 in suit has been a determined effort on the part of defendant to profit and usurp the benefits of plaintiff's research and development, in deliberate disregard of the rights conferred on plaintiff by the Stookey patent. Defendant's infringement of that patent has been deliberate and intentional.

## CONCLUSIONS OF LAW

1. Defendant has infringed Letters Patent No. 2,920,971 by its manufacture and sale of its RP–31 COOKWARE.

---

31. Tr. 2657–60.

32. Tr. 2661–62, 2808–12.

33. Tr. 2661, 2811–12.

34. Tr. 2862–63.

35. PX–174, 181, 196.

36. Tr. 2840–42, 2855, 2871–72.

37. See Finding of Fact 15, supra.

38. Tr. 709–20; compare PX–61–A and PX–62–A; compare PX–61–C and PX–62–C.

2. Defendant has infringed Letters Patent No. 2,920,971 by its manufacture and sale of its ZTS–3 COOKWARE.

3. Defendant's infringement of Patent 2,920,971 has been deliberate and intentional.

The foregoing Findings of Fact and Conclusions of Law constitute the Court's determination of the infringement issue in this patent suit. However, in light of the fact that one issue crucial to the ultimate disposition of this lawsuit—the defense of anti-trust —misuse—remains for decision, no final judgment on the issue of infringement will be entered until the anti-trust— misuse issue is decided.

Submit order in accordance herewith.